IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

WILLIAM KIRKLAND,

　　　　　　　　Plaintiff,

　　　　v.　　　　　　　　　　　　　　C-1-02-364

MAYOR CHARLIE LUKEN, *et al.,*

　　　　　　　　Defendants.

## ORDER

## I. Introduction

Plaintiff brings this action pursuant to 42 U.S.C. § 1981, 42 U.S.C. § 1983, and 42 U.S.C. § 1985 for alleged violations of civil rights secured by the United States Constitution.  He also asserts claims under state law.  Pending before the Court are plaintiff's objections to the Report and Recommendation of the Magistrate Judge (doc. no. 38), plaintiff's Motion for Evidentiary Hearing (*id.*) and defendants' Response (doc. no. 40).  The Magistrate Judge recommended that defendants' Motion for Summary Judgment be granted, judgment be entered in defendants' favor, and this case be terminated upon the docket of this Court (doc. no. 32).

2

## II. Summary Judgment Standard

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue of material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under governing substantive law, might affect the outcome of the action. *Celotex*, 477 U.S. at 323.

While all facts and inferences must be construed in a light most favorable to the party opposing the motion, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), that party "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

## III. Plaintiff's Objections

Plaintiff makes the following objections to the Report and Recommendation of the Magistrate Judge:

> 1. Plaintiff objects to the Magistrate Judge's finding that this complaint arises from his *conduct* at, and removal from, two public meetings of the Cincinnati City Council. (R&R paragraph 1, pg. 1).
>
> 2. Plaintiff objects to the Magistrate Judge admonishing him for referring to Mayor Luken as "Charlie." (R&R footnote 2, pg. 1)

3

3. Plaintiff objects to the Magistrate Judge's finding that he was removed from the City Council meeting by Sgt. Gladden for stepping away from the podium and approaching the Mayor while shouting loudly. (R&R paragraph 1, pg. 2). [1]

4. Plaintiff objects to the Magistrate Judge's finding that it is unquestionably clear that defendants Mayor Luken and Vice–Mayor Reece are protected, at least, by qualified immunity (R&R paragraph 1, pg. 4), and that when plaintiff was removed from each Council meeting, Mayor Luken was enforcing an appropriate time, place, and manner restriction. (R&R paragraph 3, pg. 6). [2]

5. Plaintiff objects to the Magistrate Judge sua sponte introducing into the litigation Cincinnati City Council Rule 2.6. (R&R paragraph 1, pg. 6).

6. Plaintiff objects to the Magistrate Judge's finding that defendants Luken and Reece or the other defendants are entitled to qualified immunity. (R&R paragraph 3, and 4, footnote 4, pg. 6). [3]

## IV. The Record

In arguing their positions, the parties refer to a videotape made of the first City Council meeting on May 23, 2001. For reasons that do not readily appear in the record, the tape has not been made available to this Court. Accordingly, the Court is unable to refer to the videotape. The parties have also submitted the trial transcript (t.t. #20) and the sentencing hearing transcript (s.t. #19) in *State of Ohio*

---

[1] The Court believes plaintiff means to object to the R&R lines 5, 6 and 7 of page 2.

[2] The Court believes plaintiff means to object to the R&R paragraph 2, pg. 6.

[3] The Court believes plaintiff means to object to the R&R paragraph 3, and footnote 4, pg. 6. Paragraph 4, which begins on pg. 6 and continues to pg. 7, raises issues that were decided in favor of the plaintiff.

4

*v. William Kirkland*, Case No. 01-CRB-17165 in the Municipal Court of Hamilton County, Ohio, to assist the Court in its determination of plaintiff's objections.  The Court finds there is a manifest necessity in the interest of justice to unseal the transcripts and consider them in resolving plaintiff's objections.

## V.  Facts

The facts giving rise to this case are as follows:  Plaintiff attended a City Council meeting on May 23, 2001, completed a speaker's card, and, after the discussion of the items on the agenda had been completed, was called to the podium to speak on a non-agenda item for a period of time not to exceed two minutes.  After using the term "Nigganati," plaintiff was ruled out of order by Mayor Luken, whereupon plaintiff stepped away from the podium and approached the Mayor while shouting loudly, as a result of which he was asked to leave the meeting by Sergeant Gladden several times.  Plaintiff refused to leave unless he was placed under arrest.  Plaintiff was then arrested by Sergeant Gladden and transported to the Hamilton County Justice Center by Officer Sneed, who filed a complaint against him for criminal trespass in violation of O.R.C. § 2911.21. Plaintiff was tried and convicted of that offense by the Hamilton County Municipal Court.  *State of Ohio v. William Kirkland*, Case No. 01-CRB-17165.

The practice in effect on May 23, 2001, for the right to speak on a non-agenda item at a City Council meeting is described by Mr. John J. Cranley, IV in the following testimony given during Mr. Kirkland's criminal trial:

5

DIRECT EXAMINATION

BY MS. CRAWFORD:

Q.  State your name for the record, sir, and spell your last name.

A.  My name is John J. Cranley, IV.  C–r–a–n–l–e–y.

Q.  And how are you employed?

A.  I'm a City Councilman.  And I'm a lawyer at the law firm Taft, Stettinius & Hollister.

Q.  Okay.  And how long have you been a City Councilman, Sir?

A.  Since December.

Q.  Of?

A.  2000.

Q.  2000?

A.  Yes.

Q.  And were you attended – in attendance at the City Council meeting on or about May 23rd, 2001?

A.  Assuming that's the time when Mr. Kirkland was arrested, yes.

Q.  Okay.  Tell me about the procedure about how someone gets the privilege of the floor?

6

A.  Basically what we have, there are a couple different ways depending on whether it's a committee or a Council meeting.  But generally speaking you can at the permission of the Chair or a member of Council you can speak on a particular issue.  And then you can speak for two minutes per individual at the end of each committee meeting and City Council.

Q.  Okay.  I'm not clear about that.  Can you say that one more time quickly?  You said that at the end of – say that again?

A.  At the end of Council meetings as well as committee meetings.

Q.  Okay.

A.  Any member of the public generally speaking is allowed to fill out a card and have two minutes.

Q.  All right.  And is the City Council chambers, in fact, the people's chamber?

        MR. COSGROVE: Objection

        THE COURT: Basis?

A.  That's --

        MR. COSGROVE: That's a characterization of people's chamber.

Q.  As a rule.

        THE COURT: You can answer as best you can answer.  I believe the question is is it the people's chamber.

A.  Okay.  It's the people's chamber.

Q.  And what does that mean, people's chamber?

7

A.  It means that the elective body, the voice of the people, is the voice of those who are elected and who try to discern the will of the people and legislate on behalf of the common good.

Q.  All right.  And can you tell me on this particular date, May 23rd, 2001, isn't it a fact during the time Mr. Kirkland spoke, he was speaking on a non-agenda item?

A.  I think that's right.

Q.  Okay.

A.  That is my memory.

Q.  What is?

A.  That's my memory.

Q.  Okay.  What is a non-agenda item?

A.  Presumably what you mean by that is he spoke at the end of the meeting as opposed to during the course of agenda items.

Q.  What?

A.  What we try to --

Q.  I was asking you what was the difference.  I think you were explaining about what a non-agenda item is.

A.  Well, what we like to do at the end of the meeting, on a non-agenda item opportunity to speak is to give someone an ability to speak about anything they like.

Q.  Anything they like.  And when you say anything they like, what do you mean by that?

8

A.  Well, the theory is that, you know, if somebody – if somebody, let's say, some person has a bad sewer in their neighborhood; or if somebody feels strongly that we need to care more about the mentally ill, you know; or mental health issues; or somebody cares about things; we should pay more attention to litter, you know; it's an opportunity for people to come down and sort of put things on the table that normally wouldn't be on the table in the course of a regular agenda.

Q.  Now, would that include someone who is upset or angry about the Police Chief using the "n" word?

A.  Sure.

Q.  Okay.  And, okay, if someone used that speech and specifically used the "n" word in context of explaining something that they're unhappy about, would that be acceptable?

A.  I think its highly circumstantial.

Q.  And it depends on what?

A.  You know, if you are reading Huckleberry Finn, and you use the word in specific context, I think it depends.

Q.  Just depend?

A.  It depends on the circumstances.

Q.  All right.

A.  Obviously, I think as a general rule, especially in a City Council meeting which since it is aired on TV, a lot of times people at home flip through channels and see it. And I think that it would be almost never appropriate to use that word in City Council meetings.  But, sure, hypothetically speaking, you would have a circumstance where you were reading something else that somebody else said.  Something like that.

9

THE COURT: Very well.

A.  Huckleberry Finn.

THE COURT: Very well.

MS. CRAWFORD: Thank you, sir.

Q.  And on this particular date were you the one who gave William Kirkland the privilege of the floor for two minutes?

A.  Probably.  I usually at the end of the meeting am the one who will call people up.

Q.  So, even though you give the privilege of the floor, the Mayor can revoke the privilege?

A.  It's merely a procedural play.  I just unfortunately am delegated to the role of calling everybody up.  For some reason under the Rules of Council the Chairman of the Law and Public Safety calls the people during the regular Council meetings.   The Mayor is President of the meeting.  That has nothing to do with anything else.  It's purely administerial.

Q.  And, so, the way people come before the City Council body is through a speaker's card request; is that true?

A.  That is correct.

Q.  Okay.  Let me show you what's been marked as Defendant's Exhibit No. 2.

(Defendant's Exhibit No. 2, a copy of cards, was marked for identification purposes as Defendant's Exhibit No. 2.)

A.  Okay.

Q.  Can you identify that document?

10

A.  Yeah.  These look like the very typical speakers request cards.

Q.  All right.  And I'm referring you to specifically to the lower left–hand box.  Does that look like a speaker's card for William Kirkland?

A.  It does.

Q.  And did you actually review the speaker's cards before these speakers came up to speak?

A.  I normally do, and --

Q.  I'm sorry.  And why would you normally do that?

A.  Well, because usually as you --as most people realize, meetings are very lengthy.  And sometimes you distract yourself.  And I usually distract myself by looking through the cards, seeing who is going to speak, you know, and have they written anything.

Sometimes people write funny things.  Other times they don't write anything.

Q.  And William Kirkland did indicate on his speaker's card the subject matter of which he wanted to speak on?

A.  He did.  But, you know, it's interesting.  I honestly do not remember ever seeing this on his card.

Q.  But that's a copy of the speaker's card; right?

A.  It looks like a copy.  I don't know if it's the same one he handed in that day.  The do --as a lot of people know, Mr. Kirkland comes to most of our meetings.  So, there were probably hundreds of card that he has turned in over the years.

Q.  All right.

11

A.  And I don't remember.  Usually I remember like Mr. Kirkland has a tendency to put creative subject matters on his card.  You know, the state of race in Cincinnati, or racist police, or something like that.  And usually from a pure interest, I look at them and read them.  And I've never seen this one before.

Q.  Now, what does the subject matter say on this card?

A.  It looks like "N" NATI Ed campaign.

Q.  "N" NATI Ed campaign?

A.  Yeah.

(t.t. #20, pp. 82-90).

Mr. Kirkland testified during the criminal trial as follows:

WILLIAM KIRKLAND

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. CRAWFORD:

Q.  Sir, state your name for the record and spell your last name.

A.  William Kirkland. K-i-r-k-1-a-n-d.

Q.  Okay. And for the record would you state your residence?

A.  (Street Address), Cincinnati, Ohio.

Q.  Okay. All right. And how are you employed, sir?

A.  United States Postal Services.

12

Q.  All right. And are you also a candidate for Council?

A. Yes, ma'am.

Q.  Do you recall going down to City Hall on 5-23-01 for a Council meeting?

A.  Yes, ma'am.

Q.  Prior to that date how many times have you been down there to speak at public meetings?

A.  Most of my adult life. I got out of the United States Marine Corp. And I returned to Cincinnati in 1981. And I immediately began to participate in civic activities which included going down and speaking before City Council.

Q.  And, again, prior to the date of 5-23-01, what type of things in the past have you gone down to speak about?

A.  Virtually almost every subject matter that the Council deals with in addition to issues that they may not feel politically germane for them to deal with. I can't give speeches.

Q.  There have been shooting incidents in the City that you've spoken on?

A.  Yes, ma'am.

Q.  Race issues?

A.  Yes, ma'am.

Q. Okay. And in the past have you ever – – have you ever violated the two minute privilege of the floor?

A.  At the podium?

Q.  Hm – mmm .

13

A.  I've gone over a couple of seconds on occasion.

Q.  Okay. Have you ever been put out of chambers for that?

A.  No, ma'am, I haven't.

Q.  Have you ever been loud and boisterous in meetings?

A.  Often.

Q.  Often?

A.  Yes.

Q.  And has anything ever happened as a result of that conduct in the past?

A.  Other than what you would consider negative commentaries from the local newspapers, the likes of Peter Bronsons and others at The Cincinnati Enquirer. Their characterizations.

Q.  Okay.  And have you ever been arrested for criminal trespass as a result of any conduct in the past at these meetings?

A.  No, ma'am.

Q.  Have you ever been arrested for any type of conduct that you displayed at these meetings in the past?

A.  No, ma'am.

Q.  Okay.  And have you ever used terms such as Nigganati before Council meetings?

A.  Yes, ma'am.

Q.  How many times?

14

A.  I only began using the term -- I can't say. I can't answer the question specifically but numerous.

Q . Numerous times?

A.  Yes, ma'am. And I've used it since the May 23rd incident.

Q.  At Council meetings?

A.  Yes, ma'am.

Q.  Was Charlie -- Mayor Charlie Luken present?

A.  Yes, ma'am.

Q.  Were you criminally charged?

A.  No, ma'am.

Q.  Let's talk about this date, May 23rd, 2001. Why did you go to City Council on that day?

A.  To commemorate the anniversary of the Chief of Police using the term nigger to a subordinate officer and the City Manager having not taken discipline against the Chief of Police. And also the Chief of Police was facing new credible allegations of having beaten his wife. And it was an opportunity to continue to keep the issues exposed. And to do what I called the education campaign. To keep issues out there.

Q.  All right. Did you fill out a speaker's card on this date?

A. Yes, ma'am.

Q.  Let me show you what's been marked as Defendant's Exhibit -- Defendant's -- I'll show you what's been marked as Defendant's Exhibit No. 2. Can you identify that document?

15

A.  Yes.

Q.  What is it?

A.  These appear to be a photocopy of the speaker's request cards.

Q.  All right. And do you see your speaker's request card on that page there?

A.  Yes, ma'am.

Q.  And is it shown in the lower right-hand corner?

A.  Or left.

Q.  I'm sorry. Is it the left?

A.  Left-hand corner.

Q.  And does it indicate on the speaker's card the subject matter about what you wanted to speak?

A.  Yes, ma'am.

Q . And what is indicated on that document?

A. It says "N" NATI Ed campaign.

Q.  Okay. And when you say "N" NATI, the N is in quotations?

A.  Yes, ma'am.

Q.  And what are you referring to specifically?

A.  As I stated, Nigganati is what I refer to.

Q.  Is that n-i-g-g-e-r or n-i-g-g-a?

A.  N-i-g-g-a.

16

Q. Okay. And why did you feel it was appropriate to title this campaign that word?

A. As this being May the 23rd and for all of the other reasons I stated, as it's why I was there on this date, as you know the untimely death of Timothy Thomas occurred April the 7th, we were coming off of the heels of the quote unquote unrest or the rebellion. And it's just some things that were happening there I didn't see Council taking the political backbone to do with respect to the Chief of Police or the City Manager.

And, as I stated, I wanted to continue to expose that as well as to embarrass the City Council.

Q. Have you ever heard the term n–i–g–g–a used before?

A. Yes, ma'am.

Q. Are you familiar with whether the term was used in connection with a police officer?

A. Yes, ma'am, it was.

Q. What's your recollection of that?

A. That there were two Cincinnati Police Officers. And they were making an arrest. And after – – during the processing one of the Officers --

MR. COSGROVE: Objection.

THE COURT: Basis?

MR. COSGROVE: Hearsay.

THE COURT: Do you wish to be heard on the hearsay objection?

17

MS. CRAWFORD: Your Honor, I think the Court can take judicial notice of this incident that occurred. It was a case that was tried and arbitrated in the Hamilton County court system where the police officers were exonerated. One Officers [sic] was exonerated for using the term n-i-g-g-a. And no action was taken in the court system against him as a result of using that term.

And this is the way this ties in, Your Honor, is because specifically the Mayor silenced Mr. Kirkland for using that term before Council.

THE COURT: I'm just focused on whatever occurred on May 23rd, if anything.

MS. CRAWFORD: Okay.

THE COURT: The objection calls for evidence that is not properly admissible. And the objection is sustained at least as --

MS. CRAWFORD: Okay.

THE COURT: -- stated in the question.

MS. CRAWFORD: All right.

Q . When you were speaking at Council meetings -- the Council meeting on May 23rd, 2001, did you have the privilege of the floor for two minutes?

A. Yes, ma'am.

Q. What is your understanding of having the privilege of the floor mean?

A. That you have followed the customary procedure to fill out a speaker's card. Once you're recognized, that you get the opportunity to speak before council or a committee. If it's council, the entire council, then it's for two minutes.

18

And you can speak on any issue that you would like during the non-agenda items as issues as long as you don't violate the law. That's my understanding. And on this day I'm not understanding how the Mayor can sanction William Kirkland who he has no authority over a private citizen, who has been given the privilege of the floor, and once you extend that privilege to one, it becomes the right of others.

Yet, he takes no disciplinary action for the City Manager or the Chief of Police. That was the basis of the argument and the expression.

Q.  Now, had other people come up to the podium before you and expressed their two minutes worth on whatever they wanted to speak on?

A.  Yes, ma'am.

Q.  And had the Mayor interrupted any of the prior speakers?

A. No. No, he hadn't. In fact, there was one speaker who approached the podium with the privilege and the permission. And that speaker during the course of his speech he approached the Mayor, as well as the other members of Council, each individual member of Council.

And there was an outcry from the audience. And rather than admonishing the citizen, who the public thought was out of order, the Mayor admonished the public.

(t.t. #20, pp. 92-100).

19

Mr. Kirkland further described the mood of those in attendance at the May

23, 2001 meeting and what occurred at the meeting:

> A.  If you notice, as I approached the podium, I take a piece of tape off of my mouth.  There was a lot of mumbling and grumbling going on in the audience.  So, I had sat there for an hour with the tape over my mouth because the Mayor had kept telling the public to shh, shh, shh, shh, and be quiet.  He kept telling them over and over and over to be quiet.

> So, to make again a political statement but a silent statement, I wrote the words shh, shh, shh, shh.  And put the tape over my mouth.  So, as I approached the podium when the Mayor's actually – – he said you have the floor for two minutes.  He never said privilege.  He said you have the floor for two minutes.

> And I referred to him as Mr. Charlie.  And then I make the comment that all of these black people and I was referring to the ministers getting up here and they were talking about boycotting the Taste of Cincinnati, and I was saying, you know, they were standing up here like they were all strong.  And I said this is not a Taste of Cincinnati.  This is Niggernati.   And I was laying the foundation to go in to what I considered my educational campaign.

> I was about to mention this.  The Mayor at this time hit the gavel.  But I do remember him saying remove Mr. Kirkland.   And I immediately snapped out of the character that I was portraying.

(t.t. #20, pp. 101–102).

Mayor Luken testified at the criminal trial as follows:

> A.  As I said, he had a white tape or something across his mouth.  And he took it off.  And he began talking to me as "Mr. Chollie" which is what he has done on prior occasions.  And in a very derogatory fashion. And then he – – then he made a comment.
>
> And I don't know the exact – – the exact preface to the comment.  But he used the "N" word that I automatically ruled him out of order immediately.  And then he began yelling about not letting him have his two minutes.  And I asked Sergeant Gladden, a Cincinnati Police Officer, to have him removed from chambers.
>
> And at some point he rushed the Mayor's chair.  He came.  Rushed up.

(t.t. #20, pp. 17–18).

Mr. Luken's testimony continues as follows:

> A.   My intention was to have him removed from  the chambers.  That's right.
>
> Q.   And by what authority is it that you have  the authorization to have someone removed from Council meetings?
>
> A.  Pursuant to the Rules of City Council.
>
> Q . Okay.  Do you know the specific rule?
>
> A.   No, I don't.   There are several rules that come together that authorize the Chair to have the discretion to rule someone out of order, or out of decorum.
>
> Q.  Hm–mmm.
>
> A.  And that ruling can be appealed by another member of Council if the –– if Council members would like to appeal it.  So, I, as Chair ––

Q.  Hm – mmm.

A.  -- have the discretion to make the decision of when someone is out of order or out of decorum.

Q.  And I -- and I certainly can understand that.  Because you are presiding over the meetings and part of your job is to keep the meetings lawful and without disturbance; is that correct?

A.  That's right.

Q.  So, I understand that.  But you have no right, duty, or obligation under law to silence someone, someone's free speech; do you?

A.  I'm bound by the Constitution, the First Amendment.  If that's what you mean.

(t.t. #20, pp. 24–25).

Q.  So, even in your own rules you recognize  that the City Council chamber is the peoples chamber?

A.  Absolutely.

Q.  And that members of Council -- that the  public should be given a right to speak and be heard?

A.  Absolutely.

Q.  Is that correct?

A.  Absolutely.

Q.  That is correct?

A.  Absolutely.

Q.  And so on this particular day when my client attempted to speak, to say what he wanted to say  for two minutes, why is it that you tried to silence him  at that point?

22

A.  Because the rules also says that decorum and civility shall be observed at all times by members of Council even though it may not be reciprocated.  Council is also entitled to expect those coming before its meetings and committees to be respectful of other citizens, staff, and the members of council.  There are  rules of Council that leave -- that in my interpretation  leave the deposition about whether decorum and civility is being respected to the Chair farther down in the rules.

And I did not believe that Mr. Kirkland's comments respected decorum or civility.  And I so ruled.  And  it was not opposed by any member of Council.  And  the rules say if I say someone is out, a member of Council can appeal that.  And  -- but no one did.  And he was out of order.

Q.  Are you always consistent in how you  handle Council meetings in this regard?

A.  I try to be.

Q.  Because I think after Mr. Kirkland there  was someone who used foul language.  And  I think we can  show this on the tape.  And you never said -- you never said a word.

A.  Well, I would say, Ms. Crawford, that it's clear this is a subjective -- somewhat subjective -- determination on my part.    And I have specific certain rules about regulations for conduct that Mr. Kirkland and  everyone that comes before Council knows about.

I would not tolerate that.  I made that clear time and time again.   So, if people engage in that kind of -- those certain kinds of behavior, I rule it out of order.  And if Council supports me, the individual is asked to leave.

Q.  I understand what you are saying.  But, again, does that fly in the face of someone's First Amendment right to say -- speak about what they want to speak about for two minutes regardless of how you personally may feel?

23

MR. COSGROVE:  Objection.

> A.  No, ma'am; it does not.

(t.t. #20, pps. 29-31).

## REDIRECT EXAMINATION

BY MR. COSGROVE:

> Q.  Mayor Luken, a moment ago you read a quote which I believe  is from  the rules.  And just for the record I believe that would be like paragraph six that you read about council is also entitled to expect those to come before them to also show civility; is that correct?

> A.  That's right.

(t.t. #20, pp. 33-34).

## RECROSS-EXAMINATION

BY MS. CRAWFORD:

> Q.  According to the Rules of Courtesy and Decorum you were -- again, which is what you were speaking about. In 1.4 it reads decorum and civility shall be observed at all times by members of Council even though it may not be reciprocated.  It also indicates Council is also entitled to expect those coming before its meetings and committees to be respectful.   But there is no specific rule that says that a citizen of the City must be respectful of you; isn't that true?

> A.  You've correctly read it.

The Municipal Court ruled as follows:

> Upon the evidence, the Court finds that this case is a case about conduct and not about free speech. While the First Amendment clearly provides each of us and all of us with the right to speak freely, even our cherished freedom of speech is not inviolate.

24

As Justice Black, speaking for the United States Supreme Court, declared: "The constitutional guarantee of liberty, including free speech, implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy." Cox v. Louisiana, 379 U.S. 536, 544.

The evidence in this case reflects that the Mayor ruled defendant William Kirkland out of order when Mr. Kirkland appeared to the Mayor to violate City Council's rule of decorum. Upon being ruled out of order, defendant promptly left the podium and approached the Mayor in a belligerent and threatening manner.

The State argues that Defendant charged the Mayor. The evidence reflects that the Defendant's approaching of the Mayor was turbulent, disorderly, and menacing. When defendant charged the Mayor, the Mayor ordered defendant removed from Council's chambers. Two citizens and an off-duty police officer intervened. And despite repeated orders from the Mayor and the police officer, Defendant repeatedly refused to leave, announcing that he would not leave unless and until arrested, whereupon the officer accommodated the defendant.

Defendant Kirkland initially had a statutory and constitutional right to speak freely at the meeting. A privilege to remain and speak can be revoked, however. If the privilege to remain at a City Council meeting is revoked by the presiding officer, a citizen must leave, for to stay is to risk trespass.

If at a subsequent proceeding within the sanctity of a court, the evidence proves that the privilege has been unlawfully revoked, the offended citizen may recover civil redress and shall not be liable for trespass. However, at the time of the event, the citizen may not simply take the law into his own hands and commit turbulence at the premises in an effort to sustain his position.

25

Disputes are to be resolved safely and fairly in the courts and certainly not by the players themselves in the heat of anger either in the streets or in council chambers.

Here, defendant's remarks were merely ruled out of order by the presiding officer, whereupon defendant exacerbated the dispute by committing conduct, to wit, charging the Mayor, which turbulent, menacing and disorderly conduct and behavior became immediate lawful cause to revoke his privilege to remain on the premises of Council Chambers. When defendant refused to leave, he committed the criminal offense of trespass.

Accordingly, upon the evidence, testimony and the law, the Court finds William Kirkland guilty of trespass.

(s.t. #19, pp.3-6). Plaintiff was convicted. His statement in mitigation at his

sentencing hearing follows:

THE DEFENDANT: We have an executive, judicial and legislative branch of government. They all are entitled to respect. It needs to be taken into consideration that the rules of the court, of council of Cincinnati, by their own rules, they state that it's expected that on occasion that citizens may not have the decorum that they as council members are expected to reciprocate. That's in their own rules, Your Honor.

Further, with respect to the issue of conduct, if you take a careful review in your mind of the tape, one could argue that the most egregious conduct may have taken place at the podium when the Mayor ruled that William Kirkland was out of order and William Kirkland, of course, protested. And the officer approached.

However, upon leaving the podium and approaching the matter in a deliberate and careful but controlled manner, still arguing, the tape revealed that the police officer stood more than some five feet away. The citizen who approached is a friend who often accompanies other citizens to the council. And as we reviewed – – as we testified at trial, that is more important for us to use the forum to get our message out than it is to get arrested.

So the citizen was not necessarily assisting the officer because the officer was unable to do his job because William Kirkland was arguing, even though it's been ruled William Kirkland was acting in a turbulent and menacing manner.

The command from the Mayor, presiding official, never changed. It was always removal of William Kirkland from the podium to the vestibule. It's never changed. So with respect to that, and again, there's case law there's an understanding that the council chambers in all legislative branches, the citizens don't have a absolute right to appear there. But once the council opens up those chambers, everybody there is entitled to their First and Fourteenth Amendment rights, equal protection of the law.

As Counsel stated, I'm a candidate for the City of Cincinnati. I'm employed at the postal services bulk mail and do personal development in the community, etc., etc.

(s.t. #19, pp. 9–11).

Plaintiff has since served his sentence for his conviction. No post-conviction proceedings are pending. Plaintiff's conviction is final.

On June 27, 2001, plaintiff spoke at another public session of the City Council. At all times he remained at the podium. While addressing Ms. Reece,

he stated: "if you're not a clown stop acting like one" and told her to "stop pandering to white people." According to plaintiff, Ms. Reece "seduced Mayor Charlie Luken to join . . . [Ms.] Reece into silencing plaintiff. . . ." at that hearing.

## VI. Analysis

### A. Plaintiff's Second Objection

Plaintiff's second objection, which is to the Magistrate Judge's admonition of him for referring to Mayor Luken as "Charlie" in his complaint and pleadings, has no relevance to the merits of his case, but the Court believes it is important to address the objection in order to clarify the record. The Magistrate Judge found it improper and disrespectful that plaintiff had referred to Mayor Luken as "Mayor Charlie Luken" in his complaint and pleadings instead of referring to Mayor Luken by his given name of "Charles." The Magistrate Judge, who was a visiting Magistrate Judge, was obviously unaware that Mayor Luken goes by the name of "Charlie." Thus, it was entirely proper for plaintiff to refer to the Mayor in this manner and by no means disrespectful. Accordingly, this Court modifies the Report and Recommendation by striking Footnote 2 from the Report and Recommendation (doc. no. 32). Plaintiff's second objection is **SUSTAINED**.

### B. Plaintiff's Fifth Objection

In his fifth objection, plaintiff argues that the Magistrate Judge's reliance on City Council Rule 2.6 (f) should be stricken because this rule did not come into

effect until on or about December 1, 2001.  The defendants do not challenge this argument.  Rule 2.6 of the Rules of Council provides a procedure whereby persons will be granted the privilege of the floor to participate in a Citizen's Forum 30 minutes prior to the start of each regular meeting of Council.  Clearly, this was not the rule in effect in May and June, 2001.  This Court, therefore, agrees that Rule 2.6(f) does not apply to this case.  Plaintiff's objection is **SUSTAINED**.  The Report and Recommendation is modified accordingly.  The reference to and/or reliance on City Council Rule 2.6(f) is stricken from the Report and Recommendation.  This being so, plaintiff's Motion for an Evidentiary Hearing (doc. no. 38) to determine its relevance and constitutionality is **MOOT** and is **DENIED**.

## C.  Plaintiff's First, Third, Fourth and Sixth Objections

Plaintiff's first, third, fourth and sixth objections all relate to his claims for violation of his constitutional rights based on the suppression of his speech at the two City Council meetings.   In his first objection, plaintiff objects to the conclusions of the Magistrate Judge on page 1 of the Report and Recommendation that this Complaint arises from his "<u>conduct</u>" at, and removal from, two public meetings of the City Council.  Plaintiff appears to argue that defendants' actions were in response to his speech and not his conduct as he apparently believes the Magistrate Judge concluded.  *See* Plaintiff's objections, p. 6 ("In viewing the evidence and drawing all reasonable inferences in favor of the non moving party

(plaintiff), it is undisputed this case is more about free speech and [sic] than expressive conduct.")  His third objection appears to be related to his first objection in that plaintiff apparently claims that Sergeant Gladden violated his free speech rights by removing him from both City Council meetings.  Plaintiff states in support of this objection,

> Having demonstrated this case is about free speech it is clear on both occasions plaintiff was removed as a result of Mayor Luken and Vice Mayor Reece violating plaintiff's constitutional rights and Sgt. Gladden complying with their unlawful orders to remove plaintiff on both occasions.[4]

Plaintiff's fourth and sixth objections relate to defendants' claim that they did not violate plaintiff's clearly–established First Amendment rights, defendants Luken and Reece's claim that they are entitled to absolute legislative immunity or, at least, qualified immunity on the First Amendment claim, and the remaining defendants' claim that they are entitled to qualified immunity.  Plaintiff objects to the Magistrate Judge's conclusion that the defendants are entitled to qualified immunity.  Plaintiff maintains that he had a clearly–established constitutional right to free speech, which defendants violated at each of the Council meetings.

**i.  First Amendment Claim under § 1983**

To establish a claim under § 1983, plaintiff must prove that "(1) a person,

---

[4]Plaintiff does not state in his affidavit or anywhere else that either defendant Luken or defendant Reece ordered Sergeant Gladden to remove plaintiff from the second meeting or that plaintiff was in fact removed from that meeting by Sergeant Gladden.

(2) acting under color of state law, (3) deprived the plaintiff of a federal right." *Berger v. City of Mayfield Heights,* 265 F.3d 399, 405 (6th Cir. 2001).

Government officials performing discretionary functions are generally immune from liability for civil damages so long as their actions do not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Whether a defendant is entitled to qualified immunity is a question to be resolved at the earliest possible stage of the litigation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Resolving the issue requires a two-part inquiry: (1) "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [official's] conduct violated a constitutional right?" (2) If a violation could be made out on a favorable view of the parties' submissions, was the right clearly established? *Id.* at 201.

While qualified Immunity is afforded for administrative duties, *Haskell v. Washington Tp.,* 864 F.2d 1266, 1277 (6th Cir. 1988), immunity for local legislators for legislative duties is absolute. *Bogan v. Scott-Harris,* 523 U.S. 44, 49 (1998). The Sixth Circuit, to this Court's knowledge, has not ruled on the issue of whether the monitoring and/or disciplining of the conduct of speakers at a public hearing constitutes an administrative act, although other circuits have addressed this issue and have found that such action does constitute

31

administrative action. *See Kamplain v. Curry County Bd. of Commr's*, 159 F.3d 1248 (10th Cir. 1998) and *Hanson v. Bennett*, 948 F.2d 397 (7th Cir. 1991). This Court does not believe it is necessary to decide the question in this action as the Court finds it is unquestionably clear for the reasons explained below no constitutional violation occurred and that defendants are protected, in their individual capacity, by qualified immunity.

While it is undeniable that the First Amendment envisions the "uninhibited, robust, and wide-open" debate of public issues, it is also beyond doubt that the freedom of speech is not absolute. *Frisby v. Schultz,* 487 U.S. 474, 479 (1988) (citations omitted). The Supreme Court has established that the First Amendment does not guarantee persons the right to communicate their views "at all times and places or in any manner that may be desired." *Heffron v. International Soc'y. for Krishna Consciousness,* 452 U.S. 640, 647 (1981). The law permits the imposition of different levels and kinds of restrictions on speech, depending on the type of government property on which the speech occurred. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 44-46 (1983). The three categories of property are (1) "quintessential public forums," such as streets and parks, which have the strictest limits on government regulation of speech; (2) forums "opened for use by the public as a place for expressive activity," and (3) property "not by tradition or designation a forum for public communication," which the state, in addition to imposing reasonable time, place and manner restrictions, "may reserve

32

for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." As to the second category of property,

> Although a state is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum. Reasonable time, place and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest.

*Id*. at 46.

Time, place and manner regulations that are content-neutral must be narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication. *See Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 573 (1987). In *Princeton Educ. Assoc. v. Princeton Bd. of Educ.*, the Court recognized that "content-neutral restrictions on matters such as the time and manner of speech may be imposed at public meetings, to enable public bodies to conduct the business of government without undue interruption or distraction." 480 F.Supp. 962, 969 (S.D. Ohio 1979) (Porter, C.J.) "The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989) (citing *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 295 (1984)). "Government regulation of expressive activity is content neutral so long as it is 'justified without

reference to the content of the regulated speech.'" *Id.* (citing *Clark*, 468 U.S. at 293).

In this case, because the City Council meeting had been opened to the public for their comments on non-agenda items, the meeting was a forum "opened for use by the public as a place for expressive activity" at the time plaintiff spoke. *See Schlegel, III v. Craft,* 2005 WL 1949551 (W.D. Ky.) (citing *Jacham v. Tuscola County*, 239 F.Supp.2d 714, 728 (E.D. Mich. 2003) (city council meeting held to fall under second *Perry* category)); *Princeton Educ. Assoc.*, 480 F.Supp. at 968 (portion of school board meetings devoted to visitor recognition and participation is a public forum). Accordingly, if plaintiff's speech was curtailed and he was removed from the meeting because of the content of his speech, the restriction must have been narrowly tailored to serve a compelling state interest. If the restriction satisfied this test, then no constitutional violation occurred. Similarly, if plaintiff was removed from the meeting based on the application of a reasonable time, place or manner restriction, no constitutional violation occurred. *See Wysinger v. City of Benton Harbor,* 968 F.Supp. 349, 354 (W.D. Mich. 1997).

At the time of the events in question, rules were in effect to provide for the orderly conduct of City Council meetings and to provide members of the public a forum in which to present their concerns to the Council. Rule 1.3 of the Rules of

34

Council, "Procedure in Absence of Rule," states:

> In the absence of a rule, the chair shall declare the procedure to be followed subject to appeal.  Upon appeal, the chair shall be sustained unless a majority of council objects to the procedure declared by the chair, in which case the current edition of Robert's Rules of Order shall govern.

Rule 1.4 of the Rules of Council, "Rule of Courtesy and Decorum," states:

> The council of the City of Cincinnati recognizes that our citizens are our most valuable asset.  Our citizens deserve and should expect to receive and be given a courteous, respectful hearing of their views.
>
> The council chamber is the peoples' chamber.  Our citizens should be made to feel welcome with an appropriate greeting at the beginning of each council and committee meeting.
>
> Council recognizes that frequently our citizens make significant personal sacrifices to attend council and committee meetings as well as public hearings.  Council shall be respectful of the time being given by citizens and shall endeavor to hear from them in a prompt and timely manner.
>
> Council recognizes that citizens coming before council may not always agree with the views of some or all of the members of council.  Nonetheless those views should be heard respectfully without reproach or admonition.  In any debate of public issues differences of opinion are to be expected and the civil airing of those differences is encouraged as it helps to test ideas and develop consensus.  Debate, however, should never become a personal attack which criticizes the character of the speaker rather than the wisdom of his or her ideas.
>
> * * *
>
> Decorum and civility shall be observed at all times by members of council even though it may not be reciprocated.  This includes prompt and regular attendance at all meetings of council, including those dedicated to public comment.   In addition, while citizens are addressing council, the members of council shall not engage in lengthy side conversations.  Such conversations shall occur outside council chambers.

> Council is also entitled to expect those coming before its meetings and committees to be respectful of other citizens, staff and members of council.
>
> Members of council shall hold themselves and each other accountable for complying with these standards remembering that the council does the peoples' business.

Rule 5.3 of the Rules of Council, "Preservation of Order," states:

> The chair shall preserve order and decorum, prevent attacks on personalities or impugning of member's motives and confine members in debate to the question under discussion. The chair shall exercise final authority to take any measures reasonably necessary to preserve order during meetings and to ensure that the meeting is conducted in an orderly and efficient manner. In discharging these duties, the chair may issue directives to any member of the Cincinnati Police Department who shall be deemed a sergeant-at-arms for the mayor and council.
>
> * * *

The Court will initially address whether a violation of plaintiff's First Amendment rights occurred at the May 23, 2001 meeting. The Court believes there is no question that plaintiff was initially stopped from speaking at that meeting based on the content of his speech. That is, Mayor Luken initially directed that the microphone be turned off and that plaintiff stop speaking because of what plaintiff said – specifically, his use of the term "Nigganati"– rather than because of the manner in which he conducted himself. The Court finds, however, that Mayor Luken did not violate plaintiff's First Amendment rights by taking the action he did.

Plaintiff points out that he was speaking before City Council at the May meeting on a matter of <u>heated</u> public concern. He contends that he used the term

36

"Nigganati" as part of a political "training" exercise to demonstrate that no matter how you cloak racial epithets, they are still racial and they are insensitive. Plaintiff argues there was no control over his discourse and that the Mayor had no authority over him at a regular meeting of City Council. The Court disagrees. Mayor Luken, acting as the Chair of the meeting, was charged with the duty to preserve order. The interest in conducting orderly meetings of the City Council was a compelling state interest.

Mayor Luken correctly construed the term "Nigganati" to be a highly offensive and degrading racial slur when used by any member of the public at a government meeting. When it was directed to citizens in the audience, who were already restive, it was likely to incite the members of the audience during the meeting, cause disorder, and disrupt the meeting. This is particularly true under the circumstances in which plaintiff addressed the citizens at the heated City Council meeting in May. His words, particularly at this time and place in the history of the City of Cincinnati, were insulting to the citizens in attendance and disruptive. Plaintiff was addressing his remarks to the citizens who were present in the Council Chambers as part of a purported "educational campaign," not to City Council. His permission to speak was granted to address City Council, not the ministers in attendance. Plaintiff was clearly out of order. Mayor Luken's action declaring plaintiff out of order was objectively reasonable and proper. His action in response to the comment – directing that the microphone be turned off and that

plaintiff be removed – was narrowly tailored to achieve the compelling interest of preventing plaintiff from inciting those in attendance at the meeting to become unruly and to prevent the meeting from becoming disorderly as a result of plaintiff's use of a racial slur, whatever plaintiff's purported purpose in using the slur.

Regarding plaintiff's actual removal from the City Council meeting and subsequent arrest, plaintiff does not dispute that he had stepped away from the microphone and walked towards the Mayor's chair and was speaking loudly when Mayor Luken continued to order Sergeant Gladden to remove plaintiff from the meeting. Mayor Luken's action and Sergeant Gladden's act of removing plaintiff were reasonable time, manner and place restrictions that were based on plaintiff's conduct, which was disruptive and out of order in the context of the City Council meeting, and not on the content of the speech that plaintiff was engaged in at that point in time. Plaintiff did not have the right to approach the Mayor's chair and to continue speaking loudly away from the microphone at a City Council meeting after being directed to stop. The actions of Mayor Luken and Sergeant Gladden in response to plaintiff's actions did not violate plaintiff's First Amendment rights.

Because no First Amendment violation occurred, Mayor Luken is entitled to qualified immunity on the First Amendment claim arising from the May 2001 meeting insofar as that claim is brought against him in his individual capacity[5];

---

[5] Insofar as plaintiff brings claims against defendants Luken and Reece in their official capacities, his claims are properly construed as claims against the City. *See Hafer v. Melo,* 502 U.S. 21, 25 (1991).

38

Sergeant Gladden is entitled to qualified immunity on that claim; and the City, which may be held liable under § 1983 for injuries resulting only from the municipality's unconstitutional or illegal policies *(see Monell v. Dep't of Social Services,* 436 U.S. 658, 691 (1978)), is entitled to summary judgment on the claim.

As to the May 23, 2001 incident, plaintiff has alleged no actions by either Sergeant Sneed or Police Chief Streicher that could be construed as a violation of his First Amendment rights. Plaintiff alleges only that Sergeant Sneed arrested him after his removal from City Council chambers, which is insufficient to establish a violation of plaintiff's First Amendment rights by Sergent Sneed. Plaintiff has made nothing more than conclusory allegations against Chief Streicher. Such allegations are insufficient to support the imposition of liability against Chief Streicher. Sergeant Sneed and Chief Streicher are entitled to summary judgment on the First Amendment claim.

As to the June 27, 2001 meeting, plaintiff's allegations clearly concern an allegedly content-based restriction on his speech in that plaintiff alleges that defendants acted in response to his statements to defendant Reece that "if you're not a clown stop acting like one" and "stop pandering to white people." However, plaintiff has made no specific allegations to withstand summary judgment on his First Amendment claim based on the events that transpired at this meeting. Plaintiff alleges only that defendant Reece "seduced Mayor Charlie Luken to join Councilwoman Alicia Reece in silencing plaintiff, William Kirkland, violating William

Kirkland's Constitutional and Civil Rights." See Plaintiff's Opposing Memorandum, p. 5. Plaintiff provides no hint as to what he means by use of the term "seduced" and he gives no indication as to how these defendants acted together to silence him. Plaintiff cannot rest on the allegations of his pleadings in response to defendants' summary judgment motion but must offer some evidence in support of his claim. Because he has failed to do so, plaintiff's objections to the Report and Recommendation are not well-taken with respect to his First Amendment claim arising out of the June 2001 meeting.

### ii.  Wrongful Arrest/Malicious Prosecution Claims under § 1983

Plaintiff did not present any specific factual allegations or legal arguments in support of his wrongful arrest/malicious prosecution claims under § 1983 in response to defendants' summary judgment motion. He likewise makes no specific allegations or legal arguments in his objections regarding these claims. Defendants are therefore entitled to summary judgment on plaintiff's wrongful arrest/malicious prosecution claims brought under § 1983.

### iii. Plaintiff's § 1981 Claim

Pursuant to 42 U.S.C. § 1981(a), "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains,

40

penalties, taxes, licenses, and exactions of every kind, and to no other." In order to establish a claim for racial discrimination under § 1981, a plaintiff must prove that "(1) he belongs to an identifiable class of persons who are subject to discrimination based on their race; (2) the defendant intended to discriminate against him on the basis of race; and (3) the defendant's discriminatory conduct abridged a right enumerated in section 1981(a)." *Amini v. Oberlin College*, 440 F.3d 350, 358 (6th Cir. 2006) (citing *Christian v. Walmart Stores, Inc.*, 252 F.3d 862, 871–72 (6th Cir. 2001)). The intent element of the claim can be established either by direct evidence or inferentially. *Id.* (citing *Blalock v. Metals Trades, Inc.*, 775 F.2d 703, 707 (6th Cir. 1985)).

Even if plaintiff were asserting a violation of a right enumerated under § 1981(a), he has not come forward with evidence to show that defendants intentionally discriminated against him on the basis of his race. Plaintiff has not produced direct evidence of discrimination, and he has not shown that he was treated differently than a white individual who engaged in similar conduct. While plaintiff alleges that a white speaker approached council members to hand them documents and exceeded his two minute allotment without being ordered to be silenced, removed, or arrested, plaintiff does not allege that the speaker used a racial slur, was speaking loudly as he approached the council members after having been told to stop, or was otherwise acting in a disorderly fashion. Nor has plaintiff pointed to other inferential evidence of race discrimination. Plaintiff's

41

allegations, without more, are insufficient to withstand a motion for summary judgment with respect to this claim.

### iv. Plaintiff's § 1985(3) Claim

Section 1985(3) states, in pertinent part,

If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . [and] cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

The elements of a claim under § 1985(3) are: "(1) a conspiracy; (2) for purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Conklin v. Lovely,* 834 F.2d 543, 548 (6th Cir. 1987) (citing *United Bhd. of Carpenters, Local 610 v. Scott,* 463 U.S. 825 (1983)).

A plaintiff makes out a claim under § 1985 by showing that two or more persons conspired to deprive him of his civil rights because of his race. *Griffen v. Breckenridge,* 403 U.S. 88, 102–103 (1971). A plaintiff must show that defendants acted to deprive him of his rights with some "invidiously discriminatory animus." *Id.* at 102. Plaintiff has failed to provide any evidence that would establish that

42

any of the defendants acted with discriminatory racial animus.  Plaintiff has not come forward with evidence to show that he was ordered to stop speaking and was ordered removed from the City Council meeting on account of his race.  His allegations in the complaint are not sufficient to withstand defendants' motion for summary judgment on his § 1985 claim.

**v.  State law claims**

Finally, it is not necessary to address the merits of plaintiff's state law claims.  Under 28 U.S.C. § 1367(c)(3), the district court may decline to exercise supplemental jurisdiction over state law claims when it has dismissed all claims over which it has original jurisdiction.  The general rule is that when federal question claims are dismissed before trial, the state law claims should be dismissed as well.  *See Gaff v. Federal Deposit Ins. Corp.,* 814 F.2d 311, 319 (6th Cir. 1987) (citing *United Mine Workers v. Gibbs,* 383 U.S. 715 (1966)).

43

## VII.  Conclusion

Accordingly, the Court **ADOPTS** the Report and Recommendation of the Magistrate Judge (doc. no. 32) as modified by the foregoing.  Plaintiff's federal claims are **DISMISSED WITH PREJUDICE**.  Plaintiff's state law claims are **DISMISSED WITHOUT PREJUDICE**.

Defendants' summary judgment motion is **GRANTED.**  Judgment is entered in defendants' favor.  This case is **TERMINATED ON THE DOCKET OF THE COURT**.

**IT IS SO ORDERED.**


S/ Herman J. Weber
Herman J. Weber, Senior Judge
United States District Court